# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

**DAVID P. WEBER**

c/o Cary J. Hansel
Joseph, Greenwald & Laake, P.A.
6404 Ivy Lane Suite 400
Greenbelt, MD 20770

     *Plaintiff*,

   vs.

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**

100 F Street, NE
Washington, DC 20549-2000

and

**MARY L. SCHAPIRO**

*In her official capacity as Chairman, SEC*
100 F Street, NE
Washington, DC 20549-2000

     *Defendants.*

**\* Jury Trial Demanded \***

Civil Case No. _____

## COMPLAINT

    COMES NOW Plaintiff David P. Weber, by and through his counsel, Cary J.

Hansel and the law firm of Joseph, Greenwald & Laake, P.A., and sues Defendants,

United States Securities and Exchange Commission and Chairman Mary Schapiro, and as

cause therefor states the following:

## INTRODUCTION

1.     David P. Weber is an attorney with the law firm Goodwin Weber LLC, which specializes in fraud and forensic investigation, litigation, federal consumer protection, whistle-blowing, federal false claims act reporting, and financial regulatory compliance.  Previously, Mr. Weber was the Assistant Inspector General for Investigations for the Office of the Inspector General of the United States Securities and Exchange Commission ("SEC").

2.     The position of Assistant Inspector General for Investigations is statutorily created by the Inspector General Act of 1978, as amended.  As the Assistant Inspector General for Investigations, it was Mr. Weber's duty to direct and supervise all criminal, civil, and administrative investigations into fraud, waste, or abuse concerning SEC programs and operations.

3.     Mr. Weber brings this action after SEC officers and employees made malicious and defamatory statements against him in the news media, leaking personal information about him in violation of the Privacy Act, in response to his disclosures of SEC employee misconduct to the Commissioners of the SEC, and to members of Congress through meetings with Congressional Staff of the SEC's Oversight Committee.

4.     Mr. Weber disclosed to the Commissioners and Congress that H. David Kotz had engaged in misconduct when acting as the Inspector General.  This misconduct compromised the integrity of several OIG investigations, including the highly publicized inquiries into the SEC's mishandling of the *Bernard L. Madoff* and *R. Allen Stanford* Ponzi schemes.

5.      Mr. Weber also disclosed to the Commissioners and Congress the existence of severe breaches of SEC and national stock market computer security.  These breaches may have compromised extremely sensitive information about the computer infrastructure system of every major stock exchange, including the New York Stock Exchange and the NASDAQ Stock Exchange.  These breaches were caused by either the intentional or grossly negligent mishandling of sensitive computer equipment and data by SEC employees and management officials, all while the SEC failed to warn each of the affected exchanges of the breach.

6.      To this day, the SEC has still not adequately and fully disclosed and warned the stock exchanges of the breadth, severity, and nature of the information subject to compromise by the misconduct of SEC employees and management.  Further, no audit trail will ever be able to identify the true nature and severity of the breach, because the employees and officers at issue, themselves highly skilled in hacking, IT security, and IT security incident response, intentionally disabled and prevented the ability of the SEC to learn this information, for unknown reasons.

7.      Instead of immediately taking action to remedy these significant failures, including by full notification of the breach to the exchanges, SEC officers and employees tried to "cover-up" and "white wash" these public relations disasters by discrediting Mr. Weber, defaming him in the public media with baseless and malicious accusations, unlawfully placing him on administrative leave status, and, later, wrongfully terminating his employment based on meritless allegations.

8.      These malicious and defamatory statements were leaked by SEC officers and employees to the public media, in violation of the Privacy Act.  These leaks were

intentionally timed to inflict maximum damage against Mr. Weber.  Indeed, there are

now pending motions related to a custody dispute of Mr. Weber's three young children

which specifically cite the SEC's leaked allegations and Mr. Weber's work status as the

grounds for arguing that Mr. Weber is not fit for additional custody of his children.

Further, with every potential employer now able to read the SEC's allegations and Mr.

Weber's current work status on the internet, he is effectively unemployable in the private

sector.

9.      The United States Postal Service Office of the Inspector General ("USPS

OIG") investigated the allegations of misconduct at the SEC OIG, including the

allegations made by, and against, Mr. Weber.  On September 17, 2012, the USPS OIG

released a final report of the investigation, clearing Mr. Weber of all the allegations

against him and finding that various SEC officers and employees had engaged in

misconduct, as had been alleged by Mr. Weber.

10.     Not only has the SEC failed to investigate the malicious and defamatory

leaks against Mr. Weber and the Privacy Act violations, but it has made no effort

whatsoever to rectify the devastating personal and professional consequences that Mr.

Weber has suffered as a result of the leaks.

11.     Instead, and in spite of the USPS OIG investigation clearing Mr. Weber of

any misconduct, the SEC terminated his employment on October 31, 2012.  This

termination was unlawful and based on meritless allegations.  The sole grounds cited for

the termination were matters investigated by the USPS OIG and for which Mr. Weber

was already completely cleared by the USPS OIG.

12.     The retaliatory and tortious actions taken against Mr. Weber are in violation of the Privacy Act, 5 U.S.C. § 552a, Whistleblower Protection Act, 5 U.S.C. § 2302, the Inspector General Act of 1978, 5 U.S.C. App. 3, the First and Fifth Amendments of the U.S. Constitution, and other constitutional, statutory, regulatory provisions.

## JURISDICTION

13.     The Court has jurisdiction pursuant to 28 U.S.C. § 1331; 5 U.S.C. § 552a (g); 5 U.S.C. § 702; 28 U.S.C. § 1346(b).

14.     Venue is proper pursuant to 28 U.S.C. § 1391; 5 U.S.C. § 552a.  The events giving rise to Plaintiff's causes of action substantially occurred in the District of Columbia.

## PARTIES

15.     Until his termination on October 31, 2012, David P. Weber ("Weber") was the Assistant Inspector General for Investigations for the Office of Inspector General ("OIG") of the U.S. Securities and Exchange Commission. Weber is an attorney and certified fraud examiner. He has been employed since 1994 in various positions within the executive department of the U.S. government.

16.     The Securities Exchange Commission ("SEC") is a federal agency.

17.     Mary L. Schapiro ("Schapiro") is the Chairman of the SEC.

## FACTS

18.     Weber assumed the duties of Assistant Inspector General for Investigations ("AIGI") on January 1, 2012. He first reported for duty on January 4, 2012.  As classified by the SEC, Mr. Weber's federal personnel classification was an SK-

17-0905 Supervisory Attorney-Advisor, with the functional title of Assistant Inspector General for Investigations.

19.     As AIGI, Weber was responsible for directing all criminal, civil, and administrative investigations into fraud, waste, or abuse concerning SEC programs and operations.  Weber supervised the OIG's investigative staff.

20.     Prior to this position, Weber served as the Supervisory Counsel and Chief of Enforcement Unit I for the Federal Deposit Insurance Corporation ("FDIC"), where he was responsible for overseeing all banking enforcement activities and investigations involving state chartered banks and bank failures for the Western half of the United States.  His position was classified for federal employment purposes as a Supervisory General Attorney, CM-01-0905.  Before joining the FDIC, Weber served as the Special Counsel for Enforcement at the Office of the Comptroller of the Currency, the bureau of the Department of the Treasury which is responsible for the supervision and regulation of the national banking system.  His position was classified as NB-VI.2-0905.

21.     Weber has extensive and expert-level experience in investigating, detecting, and prosecuting some of the largest frauds within the United States.  He is also an expert on information security law, computer crime, hacking, and fraud.  He is a prior member of the Attorney General's Council on White Collar Crime, Subcommittee on Identity Theft.

22.     While Weber was at the FDIC, he was sought out by Noelle Maloney, then Deputy Inspector General, for the position of AIG for Investigations.  Weber was later offered the position and he accepted.

23.     As AIGI, Weber reported to Maloney, who was then the Deputy Inspector General.  Maloney became the Acting Inspector General for the SEC in late January 2012.  Maloney was named as the acting head of the SEC OIG after H. David Kotz ("Kotz") resigned from his position in mid- January 2012.

24.     Under the Inspector General Act of 1978, the Inspector General is appointed by, reports to, and is under the general supervision of the SEC Chairman and the other Commissioners.  The AIGI, a statutorily created position, is appointed by the Inspector General.  While the Inspector General is under the general supervision of the SEC Commission, the Inspector General Act specifically forbids the Chairman and the other SEC Commissioners from preventing or prohibiting the Inspector General from initiating, carrying out, or completing any audit or investigation.

25.     Kotz is the former Inspector General for the SEC OIG.  Kotz was appointed to this position in December 2007 and resigned in January 2012.  During his tenure, Kotz directed the investigations into the SEC's failure to detect the massive Ponzi scheme by Bernard L. Madoff and the allegations that the SEC-designated Receiver had failed to act in the best interests of the R. Allen Stanford Receivership and the Stanford investors.

26.     Kotz left the SEC after multiple allegations of misconduct were made against him.

27.     Kotz personally knew Maloney from when he served as the Inspector General of Peace Corps.  At that time, Maloney worked with him as the Director of Policy and Public Information for the Peace Corps.

28.     Within the first week of Weber's work as AIGI, he was made aware by numerous statements made to him by reporters, SEC employees, and others that Kotz previously had a personal, sexual relationship with Maloney.

29.     Upon assuming the duties of AIG for Investigations in January 2012, one of Weber's first tasks was to meet with OIG Office of Investigations ("OI") employees to be briefed on the status of any and all pending investigations.

**Plaintiff's Disclosure of Misconduct of Former Inspector General and Current Deputy Inspector General**

30.     One of these investigations, which the OI is currently overseeing, is into the SEC's oversight over the Court-Appointed Receiver in *Securities and Exchange Commission v. Stanford International Bank, et al.*, Case No. 3-09CV0298-L (N.D.TX.). This investigation was opened by the OIG on July 25, 2011.  The impetus to this investigation was a complaint filed with the OIG on July 8, 2011, by Dr. Gaytri Kachroo ("Kachroo").  Kachroo, a Boston-based attorney, served, and continues to serve, as counsel for a large group of investor victims.

31.     During the week of March 19, 2012, the Stanford Receivership Report of Investigation ("ROI") was nearing completion.  The ROI contained the draft findings of the OIG's OI into allegations of misconduct by the Receiver and the SEC.  The ROI draft was reviewed by Weber and Maloney.  The ROI was to find that the SEC violated its own policies and procedures in the appointment of the Stanford Receiver, the second-largest Receivership ever sought by the SEC in its 79 year history.

32.     A week earlier, during the week of March 12, 2012, Kachroo made contact with the OIG, seeking to have a meeting to discuss new potential information concerning the investigation.

33.     On Wednesday, March 21, 2012, at or around 4:40 p.m., Maloney instructed Weber to schedule a meeting with Kachroo for Friday, March 23, 2012. Maloney stated to Weber that while Weber was to meet with Kachroo, she herself did not want to be present at the meeting with Kachroo.

34.     Immediately after being told of her reluctance, Weber became concerned as to why Maloney did not want to attend the meeting, because, unlike other management decisions Maloney had made, where she has acted decisively, Maloney acted very slowly on making the decision to meet with Kachroo.

35.     At some time between 5:00 p.m. and 6:10 p.m., Weber went to Maloney's office and asked her why she did not want to attend the meeting with Kachroo.  Maloney responded by saying something to the effect that she "wanted nothing to do with it." Weber suggested to Maloney that while the OIG usually does not meet with other witnesses or victims, it might be helpful to meet with Kachroo to manage her expectations of the ROI's findings, which would be limited to SEC failings, rather than the failings of the Receiver.

36.     Maloney asked Weber to close the door to her office.  Maloney told Weber that she would deny the following conversation if Weber were to repeat it.

37.     Maloney then said that, "David [Kotz] was fucking that lady."  Weber expressed shock and dismay.  Maloney told Weber to "watch out" for Kachroo and to be careful when he met with her.

38.     Maloney stated that Kachroo had received special treatment.  Maloney even questioned whether the OIG would have ever opened an investigation into the SEC's oversight over the Court-Appointed Receivership in *SEC v. Stanford*.  The timing

of the initiation of the investigation and the SEC OIG's receipt of Kachroo's complaint letter tends to support these suspicions.

39.      Weber asked Maloney how she knew that Kotz was having a relationship with Kachroo.  Maloney responded by stating that Kotz had directly told her this information and would discuss it with her.  Maloney speculated that Kotz confided in her because he viewed her as a "wing man."

40.      Weber suggested to Maloney that Kotz was possibly "pulling her leg." Maloney then stated that Kotz had shown her text messages he had received from Kachroo.  Maloney said that Kotz had even shown her text messages that Kachroo had sent to him during Kachroo's oral testimony to the OIG, as part of the Stanford Receivership Investigation, on December 11, 2011.  Maloney said that one of the text messages she saw had said something to the effect that Kachroo could not bear to be giving testimony from across the table without being able to touch and kiss Kotz during her testimony.

41.      Maloney noted that Kotz had other sexual affairs in other investigations.

42.      In particular, Maloney described an affair that Kotz had during a review conducted by the OIG into the SEC's "Restacking Project," in which the SEC spent approximately $4 million dollars relocating the desks of around 1,750 SEC employees. Maloney stated that Kotz had an affair with one of the key SEC personnel involved with this project, despite being responsible for leading the review, and having personally authored sections of the final report, concerning the allegations of waste in the project.

43.     Maloney then told Weber that Harvey Pitt knew about Kotz's affair with Kachroo, as Mr. Pitt, through an associate, had made FOIA requests for Kotz's emails to Kachroo.[1]

44.     Mr. Pitt is the former Chairman of the SEC, as well as the former SEC General Counsel, and an attorney.  He frequently represents subjects and witnesses in connection with OIG investigations.

45.     Weber asked Maloney whether Kotz's emails to Kachroo had been produced under Mr. Pitt's FOIA request.  Maloney stated that the SEC had resisted the production of the emails under the personal privacy exemption of FOIA.

46.     Because of the FOIA issue, Weber asked whether Mary Beth Sullivan ("Sullivan"), Counsel to the Inspector General, was aware of Kotz's relationship with Kachroo.  Maloney responded that she did not know for certain, but that she believed Sullivan suspected the affair.  After Weber asked why Maloney thought Sullivan suspected the affair, Maloney stated that Kotz took one or more trips in which he traveled to locations near Kachroo and that Sullivan once mentioned in passing to Maloney that it seemed strange that Kotz was traveling to where Kachroo was located.  OIG investigators, and senior management in particular, only travel infrequently.[2]

47.     On March 21, 2012, by 7:00 p.m., Weber decided that he had an obligation to report what he had learned about Kotz's affairs to the appropriate authorities

---

[1] Weber later learned that Pitt did not suspect the Kotz-Kachroo affair, but rather Kotz' restacking project affair.  Further, Weber learned that the FOIA requests were made for e-mail correspondence concerning the restacking affair, and not between Kotz and Kachroo.  These FOIA requests were made by Pitt in 2009, and could not have been known by Weber at that time, as Weber was then employed at another financial regulatory agency.  Weber could not have known about the FOIA requests by Pitt unless someone told him, as Maloney did.

[2] The US Postal Service OIG Report of Investigation, discussed further *infra*, confirmed that Sullivan, as well as Maloney, both personally knew of one affair, and suspected the other, and that they had discussed their knowledge and suspicions on numerous occasions.

and that Maloney had knowledge of Kotz's affairs and how it potentially compromised numerous high profile investigations and yet utterly failed to act on that knowledge. Weber also became concerned that the Stanford Receivership Investigation ROI could not be issued due to the potential for bias and taint, in part because Kachroo was then using the SEC OIG's prior Stanford ROI, also directed and written by Kotz, to support her suit against the SEC in the United States District Court for the Northern District of Texas, on behalf of investor victims..

48.     After consultation with legal counsel, Weber determined that he should disclose what he had learned about the Kotz affair to the Commissioners.

49.     On Thursday, March 22, 2012, Weber personally reported the misconduct of Kotz and Maloney to each of the five Commissioners of the SEC, and then canceled the meeting with Kachroo.

50.     Weber reported to the Commissioners, rather than Maloney, because Maloney's failure to report Kotz's misconduct created a conflict between her personal interests and her responsibilities as Acting Inspector General.  Weber could not reasonably rely on Maloney to report or otherwise take action on Kotz's misconduct, as she had already failed to do so, starting from the time when she first became aware of it. In addition, Weber was concerned by Maloney's lack of impartiality, because of the close personal friendship and alleged sexual affair between herself and Kotz.  By failing to report, Maloney perpetuated and expanded upon Kotz's misconduct, threatening the integrity of the Stanford Receivership Investigation ROI and other investigations. Maloney also violated the Standards of Ethical Conduct for Employees of the Executive

Branch, which mandate that all federal employers must report waste, fraud, abuse of authority, or corruption to appropriate authorities.

51.     On March 23, 2012, Weber also prepared a memorandum to the Council of the Inspectors General on Integrity and Efficiency ("CIGIE") Integrity Committee reporting the same issues.

52.     Weber's report to the Commissioners was, by and large, vindicated by a later investigation by the United States Postal Service Office of Inspector General ("USPS OIG").  This later investigation concluded that Kotz appeared to have a conflict of interest related to the initiation and supervision of the Stanford Receivership investigation, in violation of the CIGIE investigative standards applicable to all OIG investigations, and the Standards of Ethical Conduct for Employees of the Executive Branch.  Additionally, the USPS OIG investigation found that Kotz may have been in violation of those same standards with respect to the Madoff investigation.  The USPS OIG also found that Kotz had an inappropriate "personal" relationship with an SEC employee in connection with the SEC OIG's Restacking review.  The USPS OIG investigation also concluded that Maloney and Sullivan did in fact have knowledge of this misconduct, yet failed to elevate their concerns about Kotz's conflicts of interest with respect to the Restacking Project audit, and the Stanford Receivership and the Madoff investigations, to SEC management or CIGIE, as required by federal law and regulation.

53.     During Weber's March 22 meetings with the Commissioners to report the misconduct, Maloney began to suspect that he was reporting the conversation she had with him the day before.  Maloney emailed Weber, asking him where he was.  Weber

emailed back, telling her that she was ethically precluded from involvement in the matter that he was handling.

54.     From that moment forward, Maloney, and other SEC officers and employees, initiated a campaign of retaliation against Weber.

55.     Immediately after Weber's email to her, Maloney began to make false claims that she was concerned that Weber was a threat to her personal safety.  Maloney brought these claims to the attention of all five Commissioners.  She sent the first email claiming her concern while Weber was personally meeting with the five Commissioners.

56.     Weber was appalled by these allegations, as they were obviously and demonstrably false.  Maloney clearly did not feel that Weber was a threat to her personal safety the evening before, when she last saw Weber and had confided extremely sensitive information about Kotz, *Madoff*, *Stanford* and the Restacking project in a private conversation with Weber.  Maloney had no new information, other than the realization that Weber was reporting the information to the Commissioners that she had failed to report, on which she could base these newly discovered supposed fears.

57.     Weber conveyed his shock to Deputy Chief of Staff James Burns ("Burns") in an e-mail, noting that he was obviously not a threat to anyone and that he was sitting in the Chairman's Conference Room, awaiting the Commissioners' decision on how to proceed.

58.     After Maloney conveyed her fabricated fears to the Commissioners, Weber met with SEC Chairman Mary L. Schapiro ("Schapiro").  Schapiro told Weber that she and the other Commissioners did not think that Weber was a security risk and that Weber could go back to his office.

59.     The same day Weber reported Kotz and Maloney's misconduct, the Commissioners voted to relieve Maloney of authority over the investigative functions of the office. This vote was memorialized in a minute entry of the Commission.

60.     Thereafter, Maloney was immediately instructed by the Commissioners that she no longer had supervisory authority over any OIG investigative personnel.

61.     The Commissioners directed that, as of March 23, 2012, Maloney was to function solely as the Acting AIG for Audit, while the then AIG for Audit, Jacqueline Wilson, was temporarily promoted to Acting Deputy Inspector General.  Pursuant to the Commission's vote, the Commission determined that Wilson, the Acting Deputy Inspector General, would report directly to the Commission on matters concerning investigations.

62.     On that same day, Deputy Chief of Staff James Burns called a meeting for all OIG personnel to announce these changes.  At that meeting, Burns told everyone that these changes were only "temporary," even though Maloney's failure to report Kotz's misconduct was egregious misconduct.  This announcement served to create a hostile work environment, in which employees were afraid to say or do anything that would harm their standing with Maloney, as they assumed that she would eventually be restored to her supervisory position as Acting Inspector General or the Deputy Inspector General in short order.  No disclosure was ever made to employees as to the seriousness of the allegations, or as to their duty to not engage in acts that were reprisals against whistleblowers.  Maloney, in short order, made sure that each and every investigative employee knew that Weber was the whistleblower, in violation of the Privacy Act, as well as the Whistle Blower Protection Act.

63.     At this meeting, Burns directed all the OIG staff that Weber remained the AIG for Investigations and would still continue as their direct supervisor.  Burns further directed that Wilson would serve as Weber's supervisor and would report directly to the Commission.  Burns ordered staff to see Wilson if they had a concern with Weber.  In the case that staff had a concern with Wilson, Burns instructed staff to see Katherine Mohan ("Mohan") in the SEC's Office of Human Resources or Burns himself, on behalf of the Commissioners.  Burns provided both his and Mohan's telephone numbers to each employee.

64.     The Commissioners struggled to find an SEC employee to oversee the concerns raised by Weber against Maloney.  Mark Cahn, General Counsel, was recused because of his involvement with the denial of Pitt's FOIA requests for the correspondence between Kotz and the SEC employee involved with the Restacking Project.

65.     These acts by the Commission impaired and fatally compromised the independence of the OIG by placing Commission management, who themselves were under investigation, described *infra*, in the position of directing and influencing day-to-day management and operation of the Office of Inspector General in direct violation of 5 U.S.C. App. § 3.

66.     Despite her demotion and her lack of supervisory authority over investigative personnel, Maloney approached investigative personnel in an attempt to gather signed statements or other information attacking Weber's integrity.

67.     At the time Maloney approached these employees, Maloney knew, or should have known, that they would be potential witnesses in an inevitable investigation

into the functioning of the SEC OIG.  By approaching these employees about Weber, Maloney was improperly influencing any such investigation.

68.     In addition, Maloney told, or caused to be told, two contract investigative employees that Weber intended to fire them.  This information was false.  Maloney and Weber had discussed the performance of these employees, but Weber had neither the authority nor the intent to fire them and Weber had not expressed anything to Maloney to make her think otherwise.  Instead, Maloney made these false statements in an attempt to harm Weber's reputation in the office and influence any future investigation.

69.     Immediately after Weber's report to the Commissioners, Maloney directed a group of OIG employees into submitting a false complaint about Weber with the SEC human resources office.

70.     On March 26th, 2012, Maloney ordered that Weber's support staff be removed from the Office of Investigations.  The pretext of this removal order was that they were supposed to report to her, and because Weber no longer reported to her, they should no longer report to him as a supposed conflict of interest.  In reality, the removal order was a retaliatory action taken against Weber and all those SEC employees who worked for him.

71.     The removal of the OIG Office of Investigations support staff made it impossible for the OI to do its job, preventing the editing, printing, and distribution of OIG reports, and served as collective punishment against the OI, and Weber, for Weber's protected whistleblowing activities. Weber and his staff then started to perform their own photocopies, printing, and distribution of OIG investigations.  On March 28, 2012, Weber

also complained in writing to SEC senior management, alleging prohibited whistleblower retaliation for the removal of support staff.

72.     The timing of Maloney's removal order was also intended to delay, hamper, and prevent Weber from filing his portion of a report that was to be submitted to Congress on March 31, 2012.  The SEC OIG is statutorily required, under the Inspector General Act, to submit semi-annual reports detailing closed and pending OIG investigations, as well as material personnel changes at the OIG.  This report would have disclosed to Congress (1) the fact that Maloney was removed as Acting Inspector General of the OIG, and (2) the existence of several investigations into the gross misconduct of William S. Fagan ("Fagan"), Chief of Security Services for the SEC.

73.     Around a week after Maloney ordered Weber's support staff removed, Weber overheard Maloney in the office bragging to other employees that he and Jacqueline Wilson, the Acting Deputy Inspector General, were not able to finish their reports on time for the March 31st deadline.  Weber immediately reported this misconduct to Wilson.

74.     Maloney's campaign of retaliation against Weber culminated on May 3, 2012, when Maloney and Raphael Kozolchyk complained to Fagan, the same individual who was the target of several OIG investigations, that Weber was a "physical threat."  As noted above, Maloney prevented the timely release of a report to Congress which would have contained information about these investigations into Fagan's misconduct.  Led by Maloney, the complaints violated a direct order of the Deputy Chief of Staff as to how to report concerns about Weber.  Those directions were to follow the chain of command by bringing the concerns to Wilson, and then Mohan or Burns.  The employees did none of

these.  Indeed, Wilson, Weber's direct supervisor, was never informed of these concerns at any point in time prior to Weber's placement on administrative leave.  Wilson also did not concur in Weber's placement on administrative leave after the fact.

75.     As the "chief" of security, Fagan knew that the allegations against Weber were false based on his own personal observations.

76.     Despite knowing it was false, Fagan brought this complaint to Jeff Heslop ("Heslop"), Chief Operating Officer for the SEC.  Heslop then signed a memorandum which placed Weber on administrative leave.  When doing so, Heslop knew the allegations in the memorandum he signed were false based on his own personal observations and information provided by the complainants.  Heslop is also the target of at least two OIG investigations, one of which was an investigation that he was personally aware of.  Heslop's personal involvement in any matters involving Weber was a direct violation of the Standards of Ethical Conduct for Employees of the Executive Branch, as they involved deeply personal and fatal conflicts of interest.

77.     On the morning of May 8, 2012, Weber was on his way to work when he received a phone call from an acquaintance with whom he worked with at the SEC.  This acquaintance asked Weber where he was and told him that many security armed officers had been posted around the office and were looking for him.

78.     Weber promptly called private counsel, picking him up on his way to work.  Once he got to the SEC, Weber was surrounded by security officers and prevented from entering the building.  During this time, and despite the outrageousness of it all, Weber was calm and professional.  Weber's calm and professional demeanor was witnessed by numerous SEC armed guards, many of whom quietly and personally

19

apologized to Weber for the actions Fagan and Heslop were taking, by using the guards

to escort him from the building.  These apologies were also witnessed by Weber's

counsel.

79.     Weber was clearly not a threat to anyone's personal safety, either at the

time when he was prevented from entering his place of work or any time during which

Maloney was making false claims about how she feared for her safety.

80.     Weber had no notice from Maloney, Fagan, Heslop, or anyone other than

the acquaintance who called him earlier, that he was to be prevented from entering the

building and that he was placed on administrative leave.

81.     These actions were taken against Weber despite the fact that a

Commission resolution was voted on by the Commission installing Wilson as Weber's

direct supervisor, and that at no time prior to removing Weber from the SEC building for

purported security concerns was Weber's direct supervisor ever consulted or even

informed.  In fact, Wilson was informed of the alleged basis for the actions of the SEC by

Weber, who promptly called Wilson after the incident from his home. SEC officials, in

the SEC building lobby, were not even willing to state whether each Commissioner was

aware and approved of the action taken against Weber, as law required.  Rather, an SEC

Office of Human Resources management official only stated that Chairman Schapiro was

aware of the personnel action.

82.     Despite her egregious misconduct and her campaign of retaliation against

Weber, Maloney was reinstated as Deputy Inspector General on May 30, 2012.

83.     At the time when Fagan and Heslop put Weber on administrative leave,

both Heslop and Fagan were the targets of OIG investigations, in which Weber had an

essential and leading role as the Chief Investigator of the SEC.

### Multiple SEC OIG Investigations Into Misconduct of Chief of Security Services

84.     William S. Fagan ("Fagan"), who prefers to be addressed by the honorific,

"Chief," is the Head of Security Services for the SEC Office of Security Services

("OSS").

85.     Fagan was the target of investigations by the OIG.  The OIG was

investigating whether Fagan had (1) improperly steered work for "threat assessments" to

a contractor run by Fagan's personal friends, (2) engaged in nepotism in hiring Security

staff, (3) covered up the sexual assault of female guard staff, and (4) led reprisals against

whistleblowers who reported Security misconduct.  The OIG was also investigating

whether Fagan (5) mishandled an incident involving a violent altercation on SEC

premises between an SEC contractor and an unknown woman, and (6) knowingly failed

to perform background checks on hundreds of SEC contractors, in direct violation of

federal regulation and Presidential Directive HSPD-12.

86.     The first of these investigations into Fagan had been initiated prior to

January 1, 2012, when Weber assumed the duties of AIGI.  Weber learned of the

investigation when he was briefed by his staff in early January 2012.  As AIGI, it was

Weber's responsibility to follow up on these investigations, and direct them.

87.     In the course of the investigation into allegations of nepotism, corruption,

sexual assault, and reprisal against whistleblowing, it was found that many, if not all, of

the staff or contractor positions in the Office of Security Services ("OSS") had financial,

family, or friendship ties to Fagan and that the OSS hiring practices were in violation of the Merit Systems principles that apply to all federal competitive service positions.

88.     One credible whistleblower, who admitted that he/she him/herself was illegally hired by Fagan, confirmed that Fagan only hired individuals with connections to him.  This whistleblower provided to the OIG physical evidence and emails documenting that Fagan hired people as repayment for favors done for him and that, in at least one instance, he unlawfully sought and obtained recruitment bonuses of substantial amounts (amounts in excess of 5% of annual salary) for new hires.  Immediately prior to Weber unlawfully being put on leave, the OIG was beginning an investigation into whether the unlawful bonuses might be part of a pay-to-play scheme that Fagan was allegedly running.  Weber would have directed any such inquiry.

89.     In the course of this same investigation, the OIG discovered that the threat assessment firm, At-Risk International Corporation ("At-Risk"), which was hired by Fagan last year and which conducts all of the threat assessments for the SEC, was unlawfully sole-sourced to Fagan's former "buddy," with whom Fagan is connected through friendship, business, or financial ties.  Weber was in the process of investigating this allegation when he was unlawfully placed on leave.

90.     Not coincidentally, At-Risk is the same threat assessment contractor which was then tasked by Fagan to perform the supposed threat assessment against Weber.

91.     At-Risk has never previously removed any other employees from the SEC building despite occurrences of threatening and emotional behavior.

92.     At-Risk has never previously concluded an SEC employee to be a "physical threat" without talking to them first.

93.     At-Risk never spoke with Weber before he was unlawfully placed on leave.

94.     The U.S. Postal Service OIG Report of Investigation later concluded that, while At-Risk was tasked with the supposed threat assessment, Fagan was intimately and personally involved in the threat assessment.  The U.S. Postal Service OIG specifically found that Fagan was personally aware of the SEC OIG investigations into his misconduct, led by Weber, and accordingly, his involvement in the threat assessment of Weber was in direct violation of the Standards of Ethical Conduct for Employees of the Executive Branch.

95.     The same whistleblower who confirmed Fagan's misconduct also told Weber, under oath and before a court reporter, that Mary Plache ("Plache"), Acting Branch Chief for Security at the OSS, and Fagan were "out to get" Weber because of his involvement in the investigations of their misconduct.  The whistleblower also alleged that Plache was hired without meeting the qualifications for the position, and had a relationship with Fagan prior to being hired at the SEC by Fagan.  Plache, in her last position at the Federal Rail Administration, was an economist, not a security specialist. Fagan too was previously employed at the Federal Rail Administration.

96.     This whistleblower also told Weber that Fagan watched the video feed from security cameras outside of the OIG suite, in order to determine the identities of the potential whistleblowers into his misconduct. This whistleblower further stated that SEC employees and contractors were so fearful of Fagan and his routine surveillance that they would only meet with SEC OIG staff if the interviews were conducted in offices of other federal agencies outside the control of Fagan.  Indeed, Weber and his subordinate

investigator met this whistleblower at another federal OIG office to eliminate concerns of Fagan identifying the whistleblower on surveillance camera footage.

97.     This whistleblower, who was responsible for performing physical security for the SEC, was ultimately transferred by Fagan, and his/her position was filled by a 23 year old female, who has no experience in security services and whose father has a personal connection to Fagan.  This replacement employee was hired directly after college graduation, with no security experience whatsoever, and in violation of the Merit Systems principles for competitive service hiring.

98.     In the course of this same investigation, the OIG also determined that Fagan had taken retaliatory actions against whistleblowers who had reported that Fagan had failed to take meaningful action against a Contracting Officer's Technical Representative ("COTR") who was alleged to have sexually assaulted female contractor armed guards and improperly fraternized with others.  Instead of firing this COTR and reporting the sexual assaults to the appropriate law enforcement agencies, such as the OIG, Fagan simply transferred him to another location.

99.     In order to exact revenge against the whistleblowers who reported his mishandling of this incident, Fagan initiated a reduction in the SEC's contract armed guard force, causing those whistleblowers to lose their jobs.  Some of these SEC contract employees had been employed by the SEC for substantially more than a decade.  In this reduction, Fagan targeted those whistleblowers by including the titles of their positions in the jobs to be eliminated.  In particular, and as one example, Fagan eliminated the position of "Captain of the Guards," which was held by only one person, who Fagan knew was a whistleblower to the OIG against him, and who gave sworn, on-the-record

testimony, concerning Fagan's misconduct surrounding the sexual assault of female

guards. Fagan claimed that this reduction was properly performed, and that he had the

Federal Protective Service, a federal agency in the Department of Homeland Security,

perform a facility security assessment to support the basis for the reduction. Subsequent

investigation through the DHS OIG proved, however, that no such formal assessment

ever took place, and did not support the reduction. Further, the SEC OIG found that there

was little to no documentation supporting the guard force reduction.

100.    The guard force reduction, performed by Fagan for the illegitimate

purpose of taking retaliatory action against whistleblowers, has left the SEC buildings

especially vulnerable to all manners of physical security threats. Less than two weeks

after the guard force reduction, the first security breach occurred.

101.    This led to a second OIG investigation into Fagan for a separate incident

involving an altercation between a contractor with the SEC's Division of Enforcement

and an unknown woman who intruded onto supposedly secure SEC property.

102.    This contractor, a forensic IT specialist with Enforcement, brought an

unknown woman into the SEC forensic enforcement space, at the SEC's Station Place 2

building. He was able to sneak this woman into supposedly high-security space because

there was a lack of guards at the particular entrance he used. The lack of armed guards at

this location was the direct result of Fagan's guard force reduction, which had occurred

only 2 weeks earlier.

103.    This intrusion was captured on video surveillance tape, and sounded a

continuous alarm, but was not acted upon by the now sole guard stationed at the SEC

security command center. The OIG later determined that this failure was also due to the

reduction of guards manning the command center, because one guard is insufficient to monitor approximately 200 cameras and sensor systems in a three square block headquarters complex. Prior to the guard reduction in force, a minimum of two guards, and three during the day, would be assigned to operate these cameras and sensors.

104. The surveillance tapes show that at approximately 11:45 p.m., this contractor and the unknown woman got into a physical altercation. This assault occurred in the now-unguarded secure Station Place 2 lower level lobby area, near the Union Station connector. After several minutes of this woman's screaming, third party guards, who guard the connector and who were not SEC guards but rather were employed by the property management company PGP Partners, heard the screaming and intervened even though it was in secure SEC space. The third party guards allowed both the contractor and the woman to leave without even taking their identification.

105. No SEC security ever responded to this incident, despite the continuous sounding of an alarm at the intrusion location.

106. On the morning after the altercation and intrusion, Weber, and one of Weber's investigators, learned about the incident from a whistleblower. The OIG also discovered that the OSS, and Fagan and Plache in particular, were attempting to minimize the incident, by covering it up and not reporting it to the OIG or any other appropriate law enforcement agency, such as the Washington, D.C. Metropolitan Police Department. The OIG therefore took over the investigation.

107. Weber, on behalf of the OIG, was the first SEC official to notify any law enforcement agency of the incident.

108.    The OIG ultimately determined that the reason for the OSS cover-up was that anywhere from 50 to 100 SEC contractors were employed at the SEC without any background screening due to backlog.  Many of these employees, like the contractor involved in the assault, had never been screened, despite having been employed at the SEC for years.  Some of these employees, like the contractor, were granted access to the SEC's most confidential data, such as consumer records and confidential, corporate records produced to the SEC in investigations.  The failure to undertake the background screenings was in violation of government-wide HSPD-12 requirements, which are applicable to all federal employees and federal contractors.

109.    Further, the OIG obtained the contractor's criminal background, which showed that he had multiple criminal convictions and was on an early parole release from a 10 year prison sentence in the Commonwealth of Virginia for felony narcotics distribution.  Despite this criminal background, the contractor had been permitted to work with the SEC's most sensitive enforcement data as an enforcement forensic IT contractor for years.

110.    Fagan and his staff had recently granted another waiver for the contractor to work, despite these convictions.  Fagan was personally aware and had acquiesced in the granting of the waiver, as e-mail evidence showed that Fagan had acquiesced in the waiver just weeks before the altercation and intrusion.

111.    The OIG learned through multiple whistleblowers that after the commencement of the OIG investigation into the altercation and intrusion, Fagan ordered an all-hands review of all background checks of contractors, as Fagan knew that many contractors were still unscreened, in violation of the HSPD-12 requirements.

112.     The OIG also learned that Fagan and Plache wanted the matter to "go away" without the report of or prosecution of the contractor in order to minimize the publicity of Fagan's guard force reduction and his failure to conduct background investigations as required.  Fagan was also pending promotion at the time of the incident, and feared that these incidents would result in his denial of promotion.

113.     In addition to stating the OSS wanted the incident to "go away," Plache also stated to another whistleblower – who then reported the statement to the OIG - that the incident would be minimized because it would be "out of sight, out of mind," and noted that all the OSS wanted to do was to revoke the suspect's security waiver and remove him from the building, rather than address the underlying altercation and intrusion.

114.     The OIG investigation ultimately led to the determination that Fagan had engaged in a lack of candor toward and made false statements to senior SEC management concerning the intrusion and altercation, and that the OSS had failed to notify the appropriate law enforcement authorities or the OIG about the incident, as required.  The investigation also included a finding of managerial incompetence at the OSS by Fagan in failing to administer background checks and substantial security vulnerabilities in guard force and physical security of SEC buildings.

115.     Fagan knew of the existence of at least one of these investigations.  Fagan also knew that Weber was in charge of these investigations, given the responsibilities of the AIGI.

116.     Weber was heavily involved with both of these investigations.  Given Weber's position as Assistant Inspector General for Investigations, Fagan must have

known of Weber's involvement with these investigations.  These reports were in near-final form when Weber was unlawfully placed on leave.  The reports were prevented from being issued by Maloney, who held them in draft form.

117.    As Acting Inspector General, Maloney was intimately aware of these investigations and Weber's involvement with them.  Maloney also knew that Fagan was aware of at least one of these investigations and of Weber's involvement with these investigations.

118.    It was grossly inappropriate for Maloney to submit complaints about Weber to Fagan, given her personal knowledge of the OIG's investigations of Fagan. Maloney should have addressed her concerns to Wilson, Burns, Mohan, or the SEC Commissioners, as she was directed to do by direct order of the Commission.

119.    It was grossly inappropriate for Fagan to receive complaints about Weber, to perform or cause to be performed any threat assessments against Weber, and to take or cause to be taken adverse employment action against Weber, given Fagan's knowledge of the OIG's investigations into his misconduct and Weber's involvement with these investigations. Instead, Fagan should have recused himself by informing Maloney that she should bring her concerns to the SEC Commissioners.

120.    Through private counsel, Weber has notified the SEC Office of General Counsel that the OIG was investigating Fagan and that it was grossly inappropriate for Fagan to be involved with decisions regarding Weber.

### SEC OIG Investigation Into Misconduct of the SEC's Chief Operating Officer

121.    Jeff Heslop ("Heslop") is the Chief Operating Officer of the SEC.

122.    Heslop signed the memorandum which placed Weber on administrative leave.

123.    Heslop was the target of at least two OIG investigations.  Most significantly, the OIG was investigating into whether Heslop had improperly steered work for implementing the recommended reforms of the organizational study required by Section 967 of Dodd-Frank, to Booz Allen Hamilton Inc. ("BAH"). The SEC received repeated and persistent anonymous tips that Heslop was engaged in unlawful procurement and contract activities in steering millions of dollars in work to BAH. Allegations included that Heslop steered business, at least in part, due to Heslop's personal friendships with many BAH partners and principals.  Investigation revealed that one of BAH's earliest contacts with Heslop came through a close friend of Heslop, employed as a principal at BAH.   Heslop and Booz Allen Hamilton are both entities that were referred to the United States Department of Justice by the SEC OIG. This referral by SEC OIG was made by Weber personally.

124.    This investigation had been initiated prior to January 1, 2012, when Weber assumed the duties of AIGI.  He first learned of this investigation when he was briefed by his staff in early January 2012.  As AIGI, it was Weber's responsibility to follow up on this investigation, and to direct its completion.

125.    Section 967 of the Dodd-Frank Act was passed in response to the financial crisis of 2007, and the SEC's organization-wide failures to detect widespread fraud in the Bernard L. Madoff scheme.  This law required the SEC to commission an independent study to examine the need for comprehensive reform of the SEC's internal operations and structure.  The agency was then required by Section 967 to implement the recommended

reforms.  The Boston Consulting Group completed and released the reform study on

March 10, 2011.  A copy of the study can be found at:

http://www.sec.gov/news/studies/2011/967study.pdf.

126.    In order to implement the recommended reforms of the study, Heslop was

determined to engage the services of another consultant.  Many senior officials within the

agency, including the Director of the Office of Human Resources, did not believe that it

was necessary to hire another outside consultant to implement the recommendations of

the Boston Consulting Group study, at a cost to the American taxpayers of millions of

additional dollars.  Despite this opposition, Heslop directed that the SEC enter into a

blanket purchase agreement with 4 companies, so that they, or any one of them, could

serve as the consultant to implement the study.[3]  A blanket purchase agreement ("BPA")

is a contractual arrangement between a government agency and other contractors in

which the agency is able to continuously purchase supplies or services through "charge

accounts."  BPAs are typically for supplies or services for which the exact specifications

and requirements are not known in advance and are designed to cut down on

administrative costs.

127.    BAH was one of the companies in the BPA with the SEC.  While BAH

was only one of four companies in the BPA, it has been awarded most of the work,

running up bills of over one million dollars per month, all at tax-payer expense.  Multiple

complaints to OIG focused on irregularities as to how BAH was selected, and Heslop's

direct and unusual involvement with the selection, procurement, and tasking process.

[3] Thereafter, because of this opposition, as well as because the Director of Human Resources refused to
allow Heslop to burrow unlawfully into a career reserved executive position, the Director of Human
Resources was constructively terminated by the Heslop.  The Director of Human Resources has since been
hired as the Director of Human Resources of another federal financial regulatory agency.

128.    The OIG investigation found that Heslop had pushed the SEC to use BAH

for the work under the BPA.  In particular, the investigation discovered e-mail evidence

showing that Heslop had been in touch with Scott Polakoff ("Polakoff"), a principal at

BAH.

129.    Before he was the Chief Operating Officer for the SEC, Heslop was

employed as a Managing Vice President for Information Risk Management by the Capital

One Financial Corporation ("Capital One"), the ninth largest financial institution in the

United States.

130.    Polakoff, was, at the time, the Acting Director of the Office of Thrift

Supervision ("OTS"), which was then the bureau of the United States Department of the

Treasury responsible for supervision of the nation's savings and loan associations.

131.    Polakoff was later placed on leave by the Department of Treasury after it

was found that he had directed and approved the "Capital Backdating Scandal" at the

OTS during the ongoing banking crisis. The capital backdating allowed banks to maintain

a "well capitalized" status, making the banks appear healthy to investors, regulators and

depositors when in fact they were not.  Indeed, several were later determined by the

Federal Deposit Insurance Corporation to be completely insolvent, and became

substantial losses suffered by the FDIC and American taxpayers.  As a result of this

scandal, the OTS was dissolved by Congress in the Dodd-Frank Wall Street Reform and

Consumer Protection Act, and its duties were assumed by two other federal agencies, the

Office of the Comptroller of the Currency and the Federal Deposit Insurance

Corporation, both of whom were employers of Mr. Weber.

132.    The SEC OIG's investigation was, in part, focused on the possibility that Heslop was pushing BAH for the work under the BPA in order to repay the regulatory favors he owed to Polakoff.  The SEC OIG investigation was also trying to determine whether and to what extent Heslop may have benefited financially from the steering of work to BAH.

133.    In April 2012, just one month before Heslop signed the memorandum which placed Weber on administrative leave, Weber, along with AIG for Audit Jackie Wilson, who was serving as Acting Deputy Inspector General, and another Senior Investigator in the SEC OIG, presented the OIG's investigative suspicions regarding Heslop, Polakoff and BAH to the DOJ, which expressed great interest in the case.

134.    Heslop knew of the existence of this investigation because of a Reuters article on February 29, 2012.  Reuters sought his comment on the SEC OIG investigation. Heslop also knew that Weber was in charge of the investigation, given the responsibilities of the AIGI.  Heslop also knew, that, unlike Kotz or Maloney, Weber had extensive bank regulatory experience, and might well connect the dots between Polakoff's emails and visits to him, and his insistence that BAH be used to perform the SEC's work, rather than the other three companies which submitted bids.

135.    Weber was heavily involved with this investigation, including meeting with the Department of Justice over the potential misconduct.

136.    It was grossly inappropriate for Heslop to take or cause to be taken adverse employment action against Weber, given Heslop's knowledge of the OIG's investigation into his misconduct and Weber's involvement with this investigation.

137.    Through private counsel, Weber has notified the SEC Office of General Counsel that the OIG was investigating Heslop and that it was grossly inappropriate for Heslop to be involved with decisions regarding Weber.

138.    In addition to this investigation, the SEC OIG was also investigating Heslop for unlawfully attempting to convert his employment status, as a political appointee, into competitive service permanent federal appointment.  This type of personnel action is known as "burrowing in," and is often unlawful.  The Heslop "burrowing in" investigation was commenced after the SEC OIG, and Weber personally, was provided with specific testimony, and on-the-record allegations, from a senior-level whistleblower who refused to follow Heslop's unlawful order to convert Heslop to a permanent federal employee, and thereafter suffered unlawful reprisal from Heslop.  This investigation too, was begun shortly before Heslop placed Weber on leave.

### OIG Investigation into SEC Computer Network Infrastructure Security Vulnerabilities

139.    During his tenure as AIGI, Weber was also directing an investigation into the misuse of SEC issued computer equipment.

140.    The OIG had received anonymous tips from its hotline that SEC computer equipment had been mishandled, potentially exposing grave vulnerabilities in the computer network infrastructure of the New York Stock Exchange ("NYSE"), the NASDAQ Stock Exchange ("NASDAQ"), and other exchanges.

141.    As has been thoroughly documented in recent reports by the news media, cybersecurity is a national issue of paramount importance. In a recent New York Times Op-Ed by Preet Bharara, titled "Asleep at the Laptop" and published on June 3, 2012, cybercrime is described by a senior-level Department of Justice official as "one of the

greatest existential threats facing the United States," "aimed directly at our national security, imperiling our infrastructure, government secrets and public safety."

142.     SEC examiners assigned to the Division of Trading and Markets performed "penetration testing" of the computer infrastructure of the NYSE, NASDAQ, and all other major exchanges.  This testing is designed to uncover any potential weaknesses and vulnerabilities of the exchange computer infrastructure systems.  In addition, the SEC examiners also accessed, and obtained downloads, of the exchanges' entire intranet and internal infrastructure, including the exchanges' trading engines and network architecture.  This SEC examination program is titled the "Automation Review Policies," or ARPs. The SEC, through Schapiro, has recently pushed for an even more greatly enhanced ARP program for exchanges going forward.

143.     Stock exchange internal network computer systems are so sensitive that they are "air gapped" and not attached to the internet, in order to protect them from attack, intrusion, or other malicious acts by third party adversaries.  In order to compromise these closed systems (that is, cross the "air gap"), adversaries would need to rely on a witting or unwitting employee or regulator with access.

144.     The information obtained by this ARP examination program is of an extremely sensitive nature.  In the wrong hands, this information could be used to disrupt trading activities on all of the exchanges, either individually by exchange, or at all exchanges simultaneously.  Given the complete and utter reliance of modern traders on the computerized exchange, as well as the ubiquity of automated trading methods such as high frequency trading, the potential for disruption is remarkably acute.

145.    In the OIG inquiry into the alleged misuse of computer equipment, Weber and his investigators found that the laptops which were used by SEC examiners during these examinations, and on which all the information from the examinations were stored, neither contained virus protection, encryption programs, or firewalls, nor were they ever wiped clean after testing.  Some of the computers at issue were used in every stock exchange in the United States, and therefore exposed exchanges to infections or compromises that could be brought from exchange to exchange.  This was in complete violation of SEC and government-wide IT security standards for governmental computer equipment, and in direct contradictions to the oral and written representations the SEC made to regulated exchanges in accessing exchange computer and IT systems.

146.    Much to his dismay, Weber then discovered that some of these laptops were brought to foreign countries by SEC management, and by certain SEC management and employees to the "Black Hat" Conference in Las Vegas, Nevada.  The "Black Hat" Conference is an annual convention for computer hackers and security experts. Attendees to these conferences have included hackers, representatives from corporations, federal agencies, and foreign intelligence agencies.

147.    Many government and law enforcement officials who attend the "Black Hat" conference register under aliases, keeping theirs identities and employers secret. However, the SEC staff who attended, with unencrypted laptops containing sensitive exchange information, registered under their own names and identified their employer. Walking around this convention with a name tag and, regardless of name tag, registered as an SEC IT information security examiner, is the equivalent of wearing a giant target on one's back.

148.    A primary purpose of the "Black Hat" Conferences is to share information about current vulnerabilities and unaddressed critical weaknesses in network infrastructure.  For example, Black Hat Conferences have featured demonstrations showing (1) how to remotely program an ATM over a network, causing the ATM to dispense cash, (2) how to remotely hack an insulin pump, allowing a hacker to interfere and control the life-saving device from miles away, and (3) how to remotely attack water meters, potentially disrupting the water supply for public water systems utilizing advanced metering infrastructure.

149.    The "Black Hat" Conferences are infamous for the illegal activities that occur during the Conferences. In an August 4, 2009, CNN article describing these conferences, the author notes, "[a]t a hacker conference no one is safe."  Indeed, senior IT security personnel at the SEC had acknowledged to Weber as part of the investigation that they were themselves too afraid to attend this Conference.

     a.   During the 2009 Conference, websites belonging to security researchers were hacked and passwords, private e-mails, and other sensitive documents were released on a vandalized website.

     b.   During the 2008 Conference, a thumb drive that was passed around by attendees was found to contain a computer virus.

     c.   During the 2008 Conference, some attendees, themselves security experts, who used the Wi-Fi networks had their passwords "sniffed" and then posted on an electronic bulletin board called the "Wall of Sheep."  One "Wall of Sheep" participant remarked how surprising it was that so many Black Hat attendees were insecure.

     d.   Also during the 2008 Conference, three French reporters were caught hacking into the press room network.

150.    When Weber questioned the SEC examiners as to why they would bring their laptops, containing extremely sensitive information, including the architecture and trading engines of the major stock exchanges, to the Black Hat Conference, they replied to the effect that they didn't "think it was a big deal."

151.    When OIG investigators attempted to secure the laptops that were brought to the Black Hat Conference in order to examine them, the SEC employees were uncooperative, falsely claiming that certain laptops were their personal property. No laptops were tagged with US government property ID tags as required, making it difficult for OIG investigators, including Weber, to determine which laptops were property of the government.  SEC procurement officials were so remiss in their purchase of the equipment that it proved, in some circumstances, impossible for investigators to even identify the serial numbers of the relevant laptops, though purchased with American tax dollars.

152.    SEC investigators then asked the SEC employees to take screenshots on the laptops showing that the encryption and security software was enabled.  Some SEC employees complied, but later admitted that they had only turned on the encryption and security software when they took those screenshots in order to mislead investigators.

153.    Certain of the unencrypted computers used by the SEC exam staff were later found to have spyware or malware installed.  This suggests that SEC information or stock exchange information was potentially accessed by unknown individuals.

154.     Weber was greatly concerned not only about SEC negligence, but also about the potential that intentional misconduct had occurred.  It was difficult for Weber to imagine that the SEC's top computer security experts would *innocently* carry unencrypted laptops containing the architecture and trading engines of the top stock exchanges to a convention of hackers, travel overseas with the computers, have spyware or malware on their computers, and later mislead investigators as to precautions taken with their government equipment.

155.     On Wednesday, May 2, 2012, Weber brought his concerns to the attention of the SEC leadership, including Schapiro.  Weber insisted to the SEC senior management that they must disclose these potential breaches of security to the stock exchanges, so the exchanges could take necessary actions to protect themselves.  Weber also insisted that Congress be notified of these potential security breaches.  In these discussions, Weber was highly concerned that any delay could put the stock exchanges, and the United States, at greater risk.

156.     Weber was so concerned that this information should be disclosed to the stock exchanges and Congress that he told the SEC senior management team that if they failed to promptly make these disclosures to the stock exchanges and Congress, that the OIG would do it on its own accord, as required by law.

157.     This meeting took place just one day before Weber was banned from SEC premises under false pretenses.

158.     The very next day that Weber was at the SEC headquarters, he was placed on administrative leave and was not allowed in the SEC building, having been met by dozens of armed guards being personally directed by Fagan and Plache.

159.    Thereafter, Weber was eventually terminated.  Approximately one week after his termination, a report was issued to the press related to the information security issues.  The important issues raised by Weber were buried and obscured in an investigation seemingly focused primarily on employees downloading music on SEC devices.  Upon review of the press reports, it appears that certain elements of the investigation, including whether information was stolen, have been whitewashed and covered up by the SEC.

**SEC Officers and Employees Leaking of Defamatory Statements to Press**

160.    Since being put on administrative leave, Weber has been damaged by false, malicious, and defamatory statements, which have been leaked by Defendants to a Reuters reporter, and others.

161.    In an article by the reporter dated May 10, 2012, Weber is falsely described as being a "physical threat" and as "talking openly about wanting to carry a concealed firearm at work."  This information was provided to the reporter by Defendants and/or other SEC employees.

162.    These statements are false, malicious, and defamatory.

163.    Weber was absolutely not a physical threat to anyone.

164.    In that same May 10 article, it is reported that Weber was placed on administrative leave, appearing to substantiate the false allegations that Weber was a "physical threat."

165.    Weber did not talk openly about wanting to carry a concealed firearm at work.  Instead, in his capacity as Assistant Inspector General for Investigations, Weber sought law enforcement authority for members of the OIG investigative staff, an

authority previously held by SEC OIG investigators.  Under the Inspector General Act of 1978, Inspectors General, and Assistant Inspectors General for Investigations, are statutorily empowered to ask for authorization from the Attorney General to "carry a firearm while engaged in official duties," and to empower OIG Office of Investigations staff to be armed as well.  Approximately 70 out of the 73 Offices of Inspector General have such authorization, including, for example, the National Science Foundation and the Smithsonian Institution.  The SEC OIG is one of about three Offices that do not have such authorization.  Weber sought this authorization so that SEC investigators could have the means to defend themselves, and the rights of victims and witnesses.

166.    Indeed, a later USPS OIG investigation found that the allegations that Weber was a "physical threat" were entirely without substance.

167.    The USPS OIG further found that the ability of the SEC OIG to protect the rights of witnesses and victims was impeded without the proper law enforcement authority, training and equipment.

168.    The defamatory statements were made by Defendants in order to tarnish Weber's reputation and influence any inevitable investigations resulting from Weber's disclosures.

169.    The timing and the content of these leaked statements were intentionally designed to inflict maximum damage against Weber.

170.    Weber previously discussed his pending custody dispute with Maloney, Kotz, and/or other SEC officers and employers.  Weber informed them that he would be the plaintiff in the custody litigation, and that he intended to seek full custody of his three young children, ages 11, 10, and 8.

171.    Now, Weber's employment status, the alleged reasons for it and the associated defamatory and malicious leaks have become weapons repeatedly wielded against him in this custody litigation.  Indeed, there are pending motions related to the custody which specifically cite the SEC's leaked allegations and Weber's work status as the sole grounds for arguing that Weber is not fit for custody of his young children.

172.    Importantly, no other substantive arguments that Weber would be an unfit parent have been raised against Weber in the custody litigation.

173.    Given that any potential employer can read about the SEC's allegations against Weber and Weber's current work status on the internet, he is effectively unemployable in the private sector.

174.    Thus, these defamatory and malicious leaks have been designed to have the twin impact of destroying both his career and his family life.

175.    Not only has the SEC failed to investigate the malicious and defamatory leaks against Mr. Weber, but it has made no effort whatsoever to rectify the devastating personal and professional consequences that Mr. Weber has suffered as a result of the leaks.

176.    At all times relevant hereto, Defendants acted without legal justification or excuse.

177.    At all times relevant hereto, Defendants acted with an evil and rancorous motive influenced by hate, the purpose being to deliberately and willfully injure Plaintiff.

178.    At all relevant times hereto, Defendants acted deliberately and with ill will, improper motive, and actual malice.

**Plaintiff's Meeting With a Senator and Oversight Committee Staff**

179.    After being removed from duty on May 8, 2012, Weber became deeply concerned about the potentially disastrous consequences that would occur should the issues he uncovered as the AIGI remain unresolved.

180.    In particular, Weber believed that the stock exchanges should be warned about the possible compromise of their network infrastructure information so that they could take steps to protect themselves.  At minimum, Weber felt that Congress should be notified of these breaches, so that it could take necessary oversight action with regards to the SEC, which was unwilling to do the right thing.

181.    Weber also believed that Congress should be informed about the misconduct of former Inspector General Kotz, Acting Inspector General Noelle Maloney, and security contractor At-Risk.  Finally, Weber also believed that the SEC's Dodd-Frank implementation of section 967, involving potential procurement misconduct involving millions of dollars paid to BAH, required immediate Congressional oversight.  Given the way he was treated, Weber feared that the SEC would not follow up on these issues with Congress or the stock exchanges.

182.    Weber believed that the SEC was trying to "cover-up" these failures. Weber felt that the SEC, already an embattled agency, would become subject to even greater and more intense media scrutiny if it became public that it failed to protect extremely sensitive stock exchange infrastructure information, that it failed to properly investigate it's own mishandling of the *Madoff* and *Stanford* scandals, or that it could not even implement the reforms mandated by Congress in Dodd-Frank, without further misconduct and failures.

183.    Indeed, Weber's concerns were validated by the September 14, 2012 SEC Order against NYSE.  This historic Order, marking the first time that financial penalties have ever been imposed against an exchange, found, *inter alia*, that NYSE violated Rule 603(a) of Regulation NMS, which requires that exchanges distribute market data "on terms that are fair and reasonable" and "not unreasonably discriminatory."

184.    These determinations were heavily dependent on an analysis of the NYSE's internal computer architecture, the same information that the SEC failed to protect, and which, as a result of the SEC's failure, may have been compromised by the intentional or negligent mishandling of sensitive computer equipment by SEC employees.

185.    Clearly, the SEC's ability to impose this historic penalty against NYSE would have been hampered, if not rendered optically impossible, by the public disclosure of its own failure to safeguard NYSE's own internal architecture information.

186.    A week after being placed on administrative leave, Weber brought his concerns about the security vulnerabilities of the stock exchanges resulting from the SEC's mishandling of computer equipment to the attention of staff members of the Senate Judiciary Committee, who then, in turn, informed staff members of the House Committee on Oversight and Government Reform.

187.    In that meeting, Weber disclosed these security vulnerabilities to Committee staff.

188.    Weber also described to the staffers the series of events that lead to his placement on administrative leave, including the OIG investigations into At-Risk and the retaliatory actions taken against him by SEC officers and employees.

189.     As a result of this meeting, a United States Senator later met with Chairman Schapiro and other senior Commission staff.

190.     Schapiro falsely represented to a United States Senator and/or the Senator's staff that At-Risk conducted a security threat evaluation into the allegations made against Weber which found that Weber was a security risk, thus leading to his being excluded from the building and placed on administrative leave.  In fact, he was found to be a "low" risk.

### OIG Investigation into Commission Chairman Mary Schapiro

191.     During Weber's tenure as AIGI, the OIG OI received multiple referrals that Schapiro lied and perjured herself during on-the-record testimony before House and Senate Oversight Committees in connection with the SEC's bungled attempt to move to a new office space in Constitution Center.

192.     Weber personally received complaints against Schapiro.

193.     Under Weber, an initial investigation into these complaints commenced immediately prior to Weber's placement on administrative leave.

194.     Schapiro was aware about these referrals, as she was CC'd on some of them.  Furthermore, several of these referrals were publicly posted online by her accusers.

195.     Thus, Schapiro was aware that Weber was personally involved with and directing an OI investigation into allegations that she had committed perjury.

196.     Furthermore, Schapiro was also aware that Weber was actively involved with and was directing the OI investigation into the misuse of SEC issued computer

equipment.  As previously noted, Schapiro had advocated for the ARP examination

program, under which the egregious breaches of computer security occurred.

### **Investigation by the United States Postal Service Office of Inspector General**

197.    After being placed on leave on May 8, 2012, Weber learned that At-Risk

had conducted a threat assessment against Weber.

198.    This threat assessment appears to have been confirmed in e-mail

correspondence between Weber's counsel and SEC attorneys.

199.    Weber was not notified of the At-Risk threat assessment.

200.    Weber was not given the opportunity to give a statement to any At-Risk

representatives regarding this threat assessment.

201.    The details and findings of this purported threat assessment were never

made available to Weber.  Later, Weber would discover that the At-Risk threat

assessment actually determined that Weber presented a "low" risk of violence in the

workplace.

202.    On May 30, 2012, Interim Inspector General Jon T. Rymer ("Rymer")

requested that the United States Postal Service Office of Inspector General ("USPS

OIG") investigate allegations of misconduct by former and current senior management

officials of the SEC OIG.

203.    Rymer made this request because there were no SEC OIG officers or

employees who did not have conflicts of interest or appearances of conflicts of interest.

Instead, Rymer requested an outside inquiry, headed by an investigative team whose

credibility was beyond reproach.

204.    On June 6, 2012, the USPS OIG and the SEC OIG entered into a Memorandum of Agreement, allowing the USPS OIG to investigate the allegations of misconduct as requested.  This investigation concluded on September 12, 2012, and a report of investigation ("ROI") was issued on September 17th, 2012.

205.    In the ROI, the scope of the USPS OIG investigation is described as encompassing the following issues:

a.    "Whether Kotz engaged in misconduct by participating in inappropriate relationships that created conflicts of interest and whether he misused his position to improperly influence on-going investigations and audits to the benefit of those with whom he had the relationships or to further his own personal financial interests."

b.    "Whether SEC OIG management engaged in misconduct related to the handling of investigative complaints, reporting of conflicts of interest, addressing personnel issues, and improperly influencing witness statements against Weber."

c.    "Whether Weber engaged in misconduct, either by creating a hostile work environment or by making false statements."

206.    Weber actively cooperated with the USPS OIG investigators.  Weber had several interviews with USPS OIG investigators and took multiple polygraph examinations as part of the investigation.  As noted in the report of investigation, these polygraph examinations each showed that there were no indications of deception in Weber's answers.

207.    In contrast, Maloney refused to cooperate with the USPS OIG investigation at all.  In lieu of giving a polygraph examination, Maloney resigned from the SEC OIG on August 17, 2012.  Maloney also retained counsel, who notified the USPS OIG investigators that she would no longer cooperate, or provide any testimony, thereby invoking her Fifth Amendment rights against self incrimination.  Each other SEC OIG employee who made purported allegations against Weber, including Kozolchyk, also refused to submit to polygraph examinations, casting serious and fatal doubts on their candor, integrity and veracity.

208.    The USPS OIG investigation ultimately concluded that Kotz had violated numerous ethical standards with regard to the Restacking Project audit, and the Stanford Receivership and Madoff investigations.  The investigation also found that Maloney Sullivan should have each reported their concerns about Kotz's misconduct to SEC management or the CIGIE Integrity Committee.

209.    The investigation's findings vindicate Weber's efforts to report these issues to the Commissioners and the CIGIE Integrity Committee.  In fact, the investigation's conclusions confirm Weber's concerns that there were breaches of ethical standards by Kotz and Maloney, as well as his concerns for national security, regarding the compromise of stock exchange information.

210.    Significantly, the USPS OIG investigation found that there was no evidence that Weber created a hostile work environment, no evidence that he ever displayed threatening behavior within the workplace, and that Weber engaged in no misconduct in connection with his SEC employment.

211.    The investigation examined the At-Risk report that lead to the decision to place Weber on administrative leave and found that the allegations contained therein were based on hearsay and were without substance.  Indeed, the investigation found that one of the key statements forming the basis for Weber being placed on administrative leave was made by Kozolchyk, who was supervised by Weber and previously disciplined by Weber and Wilson for insubordination.  Upon being confronted with his lack of candor, Kozolchyk ultimately admitted to the USPS OIG investigators that, contrary to his complaint to Fagan, he was not physically afraid of Weber, but afraid that he would lose his job due to discipline previously taken against him by Weber.

212.    Furthermore, the USPS OIG investigation found that the while poorly prepared, even the At-Risk threat assessment actually indicated that Weber presented a "low" risk of violence in the workplace.

213.    The investigation also determined that there was no evidence that Weber made any intentional false statements or engaged in deliberately unprofessional conduct.

214.    While the USPS OIG investigation was on-going, the SEC persistently misrepresented the nature and scope of the investigation, including, for example, that the USPS OIG would investigate the unlawful leaks made about Weber.  No investigation has ever been undertaken as to the substantial leaks made by SEC officials in violation of law.

215.    Despite the fact that Weber has been cleared as not presenting a physical threat in both the At-Risk assessment and the USPS OIG ROI, he remained on administrative leave until the SEC unlawfully terminated him on October 31, 2012.

**Failure of the SEC to Follow Proper Procedures With Respect to Plaintiff's Status**

216.    After Weber was placed on administrative leave on May 8, 2012, the SEC and its officers and employees have failed to follow the proper procedures with regard to the resolution of Weber's status.

217.    The memorandum placing Weber on leave, signed by Heslop and dated May 8, 2012, notes that this is a paid, non-duty status.  The memorandum further states that Weber will remain on this status "until further notice."

218.    Since May 8, 2012, Weber has been prepared to return to duty status should he be recalled.

219.    The May 8 Memorandum states that this "is not a disciplinary action" and that "no determination has been made at this time regarding the merit of these allegations."

220.    Notwithstanding that language, the May 8 Memorandum further instructs Weber that he is "not allowed to access any SEC facility," "not permitted to login to the Commission's computer network," and "ordered to surrender all of [his] government credentials [and] not [to] use [his] official title."

221.    In an e-mail correspondence to Weber's personal attorney, dated May 11, 2012, Richard Humes stated, "Placing Mr. Weber on administrative leave is not a disciplinary action and does not represent a finding that he has engaged in any wrongdoing."

222.    Under federal regulations, the SEC is only authorized to place an employee on a paid, nonduty status when the agency has already provided a notice of proposed adverse action to the employee.  Put differently, the SEC is not authorized to

place an employee on paid, nonduty status when it hasn't proposed to take action against that employee.

223.     Had the SEC proposed to take some adverse action against Weber, he would have been able to avail himself of his procedural rights under 5 U.S.C. § 7513(b) and 5 C.F.R. § 752.404.  The SEC would have been required to give Weber 30 days advance written notice of the specific reasons for the proposed action.  Additionally, Weber would have had the opportunity to answer these charges and to furnish affidavits and other documentary evidence in support of the answer.

224.     The At-Risk threat assessment was completed on May 22, 2012.  This threat assessment determined that Weber presented a "low" risk of violence in the workplace.  The USPS ROI, issued on September 17, 2012, also concluded that there is no evidence indicating that Weber was or is a physical threat.  Despite this overwhelming evidence, the SEC continued to require Weber to remain on an administrative leave status.

### SEC's Unlawful and Retaliatory Termination of Plaintiff's Employment

225.     On October 31, 2012, Weber received a Memorandum from the SEC Chicago Regional Office with the subject line "Termination During Trial Period" (hereafter "Termination Memorandum").  This Memorandum purports to terminate Weber's employment status with the SEC.

226.     The Termination Memorandum originated from the SEC Chicago Regional Office and was signed by Regional Director Merri Jo Gillette.  The Termination Memorandum bears the witness signature of Adam Allogramento, an Attorney-Advisor at the SEC Office of Human Resources.

227.    The Termination Memorandum states that Weber's employment in the federal service is terminated, effectively immediately.

228.    The SEC's termination of Plaintiff's employment is unlawful and retaliatory.

229.    The Termination Memorandum is devoid of any legitimate grounds for termination and is replete with numerous misrepresentations and falsehoods.

230.    The Termination Memorandum falsely states that Weber has "not completed two years of current continuous service in the same or similar position in an Executive Agency" and that therefore Weber was "in a trial period" in which he has no right to appeal under 5 U.S.C. § 7511.

231.    To the contrary, Weber has continuously served for over 10 years in a same or similar position in the federal service, and been employed in varying capacities as a federal employee since 1994.

    a.    From 2000 to 2010, Weber served as a 0905Attorney-Advisor at the Office of the Comptroller of the Currency ("OCC").

    b.    From early November 2010 to December 31, 2011, Weber served as a 0905 Supervisory Counsel at the Federal Deposit Insurance Corporation.

    c.    From January 1, 2012 to October 31, 2011, Weber served as a 0905 Supervisory Attorney-Advisor at the SEC OIG.

232.    The positions held by Weber during this 10 year period were substantially similar, if not the same in terms of functions and duties. In each position, Weber served as federal personnel series 0905 attorney-advisor directing and leading investigations into fraud and misconduct, and referring actionable misconduct to the Department of Justice

for criminal prosecution.  For more than the past two years, Weber has served in a role where he has supervised and directed the work of subordinate attorneys, investigators or examiners, in conducting investigative work.

233.    Thus, the SEC, in the Termination Memorandum, falsely stated that Weber does not have a right of appeal under 5 U.S.C. § 7511.

234.    Further, the SEC intentionally or negligently omitted any notice of Weber's rights under the Whistleblower Protection Act in the Termination Memorandum.

235.    These misrepresentations, omissions, and falsehoods clearly demonstrate a calculated and concerted effort to maliciously injure Weber, in retaliation for his protected disclosures.

236.    Importantly, the factual grounds for Weber's termination are demonstrably false and are clearly a pretext for the SEC's retaliatory actions against Weber.

237.    Notably, the USPS OIG investigation cleared Weber of any wrongdoing or misconduct.  Indeed, the investigation actually validated Weber's charges of misconduct by other SEC employees.

238.    Notably, the USPS OIG report of investigation does not raise any issue of misconduct or unacceptable conduct in relation to this incident, despite the fact that the USPS OIG investigators were charged with investigating allegations that Weber engaged in misconduct and were aware of the allegation that formed the supposed basis for Mr. Weber's unlawful termination.

239.    Weber was never notified of any proposed adverse action to be taken against him.  Instead, as previously described, Weber was kept in a state of indefinite limbo during his non-duty, paid administrative leave status.

240.     Weber was never presented with any opportunity to defend himself from the specific allegations made against him in the Termination Memorandum.

241.     Given the implausible and thoroughly unpersuasive basis for Plaintiff's termination, it is clear that these allegations of misconduct are actually pretext for Defendants' retaliatory actions against Plaintiff.  Indeed, the agency charged with investigating the concern, the USPS OIG, actually found that Plaintiff did not engage in any misconduct.

## COUNT I
### (Privacy Act, 5 U.S.C. § 552a – Improper Dissemination)

242.     Plaintiff adopts and incorporates by reference the allegations contained above with the same effect as if herein fully stated.

243.     Defendants, through the actions of SEC employees and officers, willfully and intentionally, or with flagrant and reckless disregard, disseminated information protected by the Privacy Act concerning Plaintiff to reporters of the news media, and others.

244.     Many of these articles viciously disparage Plaintiff.  For example, one article, posted on the Atlantic Wire website on May 11, 2012, is titled, "Do You Really Need a Gun to Police the SEC?"  Another article, posted on the New York Post website on the same date, is mockingly titled, "SEC 'big gun' placed on leave."

245.     This information included, and is not limited to, Plaintiff's personnel record and inaccurate and defamatory information concerning his placement on administrative leave,  interactions Plaintiff had with law enforcement officials, Plaintiff's marriage, supposed history of domestic violence in Plaintiff's prior marriage, and other false and untrue allegations.

246.    Without limitation, and among other statements, Defendants publicized the following information in violation of the Privacy Act:

    a.    That Plaintiff allegedly "wanted to carry a gun at work."

    b.    That Plaintiff was placed on administrative leave after employees complained that he wanted to carry a gun at work.

    c.    That Plaintiff allegedly solicited investigators inside the SEC to participate in special training so they could become eligible for a concealed weapons permit.

    d.    That Plaintiff allegedly had his SEC identification revoked and was banned from entering the SEC headquarters in Washington by internal security personnel.

    e.    That Plaintiff allegedly was subject to an internal investigation by At-Risk, a security consulting firm.

    f.    That Plaintiff allegedly sought permission from the Maryland State Police to carry a weapon.

    g.    That Plaintiff allegedly had a "propensity for domestic violence."

    h.    That Plaintiff was previously involved in an incident where he allegedly flashed his government credentials at a police officer during a traffic stop.

    i.    That Plaintiff's previous employer, the Office of the Comptroller of the Currency, allegedly proposed to suspend him as a result of the traffic stop incident.

247.    Furthermore, and without limitation, Defendants falsely stated that:

    a.    Plaintiff was a "physical threat."

    b.   Plaintiff "talked openly about wanting to carry a concealed fire arm at work."

    c.   Plaintiff was suspended as a result of misusing his badge and credentials by the Office of the Comptroller of the Currency.

    d.   Plaintiff has a history of or a propensity for domestic violence.

248.    This information was subsequently published in news articles which were widely disseminated and are still accessible on the internet.

249.    These leaks had an obvious, injurious character, in that the leaks suggested that Plaintiff was a "physical threat" or otherwise has a propensity for violence, that Plaintiff has a history of misusing his government-issued badge, that Plaintiff was suspended by the Office o the Comptroller of the Currency, and other implications following thereof.

250.    The statement that Plaintiff was placed on administrative leave appears to substantiate the false and defamatory statements, such as the allegation that he was a "physical threat."

251.    Defendants were aware that these injurious leaks would be published in articles.

252.    Defendants were aware that Plaintiff was engaged in litigation with his ex-wife over the custody of his three young children, as this was disclosed to Defendant at the time Plaintiff was hired by Defendant.  Defendant was also aware that the leaked statements would severely undermine Plaintiff's ability to prevail in the custody litigation.

253.    Defendants were aware that any potential employers would be able to read the statements in violation of the Privacy Act, and that Plaintiff would be effectively unemployable in the private sector as a result.

254.    As a result of Defendant SEC's violations of the Privacy Act, Plaintiff has suffered adverse and harmful effects, including, but not limited to, mental distress, emotional trauma, embarrassment, humiliation, and lost or jeopardized present or future financial opportunities.

255.    Specifically, Plaintiff fears that these leaked statements will severely and unfairly injure the likelihood of prevailing in the litigation over the custody of his three young children.  Plaintiff also fears that these leaked statements will render impossible any effort to obtain gainful employment in the future.

256.    As a result of the emotional distress that he has experienced due to Defendants' violations of the Privacy Act, Plaintiff has sought treatment to mitigate the effects of the distress.

257.    At all relevant times, Defendants acted with ill will and actual malice. The dissemination of the information at issue was done intentionally to discredit Weber, to frustrate the various investigations detailed above, and/or to draw attention away from the rampant misconduct inside the SEC.  The intent of the defendants was to willfully injure and destroy Weber's reputation in an effort to silence him or encourage those to whom he reported SEC misconduct to question him or disregard the information he provided.

258.    In addition to releasing the false information at issue, the SEC refused to retract or correct it despite request, even after the allegations were proven false through the USPS OIG investigation, which was initiated by the SEC.

259.    Defendants failed to secure written authorizations from Plaintiff prior to providing the specific information detailed above, in violation of section (d)(1) of the Privacy Act.  Disclosure was not permitted by a routine exception.

260.    All of Plaintiff's injuries, losses, and damages – past, present, and prospective – were caused solely by the conduct, actions, and inactions of Defendants, as set forth herein, without any negligence, want of due care, or provocation on the part of Plaintiff, either directly or indirectly.

WHEREFORE, the plaintiff, David P. Weber, respectfully demands judgment in his favor and against the Defendants in an amount not less than TWENTY MILLION DOLLARS ($20,000,000.00) in compensatory damages and TWENTY MILLION DOLLARS ($20,000,000.00) in punitive damages plus reasonable attorney fees and the costs of this litigation, as well as such other and further relief as this Honorable Court deems just and proper.

## COUNT II
**(Privacy Act, 5 U.S.C. § 552a – Failure to Maintain Accurate Records)**

261.    Plaintiff adopts and incorporates by reference the allegations contained above with the same effect as if herein fully stated.

262.    Prior to disseminating information and records concerning Plaintiff, Defendants failed to make reasonable efforts to ensure that the information and records were accurate, complete, timely  and relevant for agency purposes in violation of 5 U.S.C. § 552a(e)(6).

263.     Defendants' failure was willful and intentional, or flagrantly, recklessly, and grossly negligent for all of the reasons stated above.

264.     Defendants compiled information concerning Plaintiff's personnel record. The information and records that were disseminated to unauthorized individuals were irrelevant, false, malicious and defamatory, incomplete, inaccurate and untimely.

265.     This information was subsequently published in news articles which were widely disseminated and which are still accessible on the internet.

266.     As a result of Defendants' violations of the Privacy Act, Plaintiff has suffered adverse and harmful effects, including, but not limited to, mental distress, emotional trauma, embarrassment, humiliation, and lost or jeopardized present or future financial opportunities.

WHEREFORE, the plaintiff, David P. Weber, respectfully demands judgment in his favor and against the defendants in an amount not less than TWENTY MILLION DOLLARS ($20,000,000.00) in compensatory damages and TWENTY MILLION DOLLARS ($20,000,000.00) in punitive damages plus reasonable attorney fees and the costs of this litigation, as well as such other and further relief as this Honorable Court deems just and proper.

## COUNT III
### (Privacy Act, 5 U.S.C. § 552a – Failure to Gather Information)

267.     Plaintiff adopts and incorporates by reference the allegations contained above with the same effect as if herein fully stated.

268.     Defendants willfully and intentionally failed to the greatest extent practicable to collect from Plaintiff information that would have refuted the allegations against him.

269.    This failure has had an adverse effect on Plaintiff.  Had Plaintiff been able to refute the allegations made against him, he would likely have been cleared in the initial At-Risk threat assessment, and thus would have been taken off of administrative leave status.  Plaintiff would have also been able to clear his name in the news media, as his return to the workplace would have indicated that he was not a physical threat to anyone.

270.    As previously noted, Plaintiff was placed on an administrative leave status without being given the opportunity to defend himself from the allegations made against him.

271.    As a result of Defendants' violations of the Privacy Act, Plaintiff has suffered adverse and harmful effects, including, but not limited to, mental distress, emotional trauma, embarrassment, humiliation, and lost or jeopardized present or future financial opportunities.

WHEREFORE, the plaintiff, David P. Weber, respectfully demands judgment in his favor and against the defendants in an amount not less than TWENTY MILLION DOLLARS ($20,000,000.00) in compensatory damages and TWENTY MILLION DOLLARS ($20,000,000.00) in punitive damages plus reasonable attorney fees and the costs of this litigation, as well as such other and further relief as this Honorable Court deems just and proper.

## COUNT IV
### (First Amendment – *Bivens* Action)

272.    Plaintiff adopts and incorporates by reference the allegations contained above with the same effect as if herein fully stated.

273.     Plaintiff has First Amendment protection for where he has spoken as a citizen on a matter of great public concern.

274.     The potential breaches of security from the possible exposure of the stock exchanges' network infrastructure vulnerabilities, resulting from the SEC's grossly negligent or intentional mishandling of sensitive computer equipment, is not merely a matter of internal affairs but rather is a matter of grave public concern.

275.     When informing the Commissioners that he was planning to disclose this information to Congress and to the stock exchanges, Plaintiff was not only acting pursuant to his duty as Assistant Inspector General for Investigations but also as a concerned citizen.

276.     While it is within the ordinary duties of the Assistant Inspector General for Investigations to investigate the mishandling of computer equipment by SEC employees, it is not within the usual scope of the responsibilities of the AIG for Investigations to make disclosures to Congress and others regarding the possible compromise in critical network infrastructure of the nation's very financial system.  Indeed, Plaintiff was attempting to have the SEC senior management make the disclosure, which, as of the date of this Complaint, they have still not adequately done.

277.     The circumstances in which Plaintiff made these statements were highly extraordinary and unique.  The disclosure of the possible compromise of the nation's financial critical network infrastructure is not a usual aspect of Plaintiff's employment.

278.     Plaintiff's speech was a substantial and motivating factor in prompting Defendants, and SEC employees and officers, to take retaliatory actions against him.  As noted, Plaintiff was placed on administrative leave on just two business days after having

told the SEC senior management of his intention to disclose this information to Congress and to the stock exchanges in the absence of the SEC's cooperation.  Plaintiff was ultimately terminated from employment on October 31, 2012.

279.    Defendants would not have taken these retaliatory actions against him in the absence of the protected speech, and the other illegitimate reasons described herein.

280.    In placing Plaintiff on administrative leave and terminating Plaintiff's employment, Defendants were acting under color of federal law, custom, usage, and regulation.

WHEREFORE, the plaintiff, David P. Weber, respectfully demands judgment in his favor and against the Defendants in an amount not less than TWENTY MILLION DOLLARS ($20,000,000.00) in compensatory damages and TWENTY MILLION DOLLARS ($20,000,000.00) in punitive damages plus reasonable attorney fees and the costs of this litigation, as well as such other and further relief as this Honorable Court deems just and proper.

## COUNT V
### (Second Amendment – *Bivens* Action)

281.    Plaintiff adopts and incorporates by reference the allegations contained above with the same effect as if herein fully stated.

282.    The stated grounds for plaintiffs eventual termination was the fact that he lawfully carried a firearm in the car with him while in a state where he is licensed to carry a firearm while on a trip during which he would conduct some SEC business.

283.    Plaintiff never carried a firearm in any federal facility.

284.    Plaintiff has a Second Amendment right to own and carry a firearm.

285.    The core purpose of the protection of the Second Amendment right is self-defense.

286.    Plaintiff carried a firearm in the vehicle with him because he was concerned for his personal physical safety.

287.    Specifically, while Plaintiff was employed with the OCC, FDIC, and the SEC, Plaintiff was involved with numerous investigations into criminal wrongdoing by suspects who were known to be active in organized criminal activity.

288.    The Second Amendment, among other rights, protects the rights of one to keep arms in one's present dwelling place for purposes of self defense.  As such, the Plaintiff had a constitutional right to possess a firearm in his hotel room during the trip in question.  The only effective means to exercise this right was to transport the firearm with him in the vehicle while traveling.

289.    Plaintiff complied with all the state and federal regulations regarding the ownership and carrying of a firearm, including having been licensed to carry the firearm.

290.    Although Plaintiff contends this fact is irrelevant, Plaintiff was off-duty at the time when he was alleged to have been carrying a firearm.

291.    The SEC has no regulations, rules, or guidelines with respect to the issue of gun ownership or the carrying of a firearm by an employee while he is off-duty.

292.    Notably, the USPS OIG investigators, who were charged with investigating allegations of misconduct by Weber and who were made fully aware of this issue by the Plaintiff himself, found that the plaintiff had not committed any misconduct. Despite this, this issue was the sole purported basis for the SEC's termination of Plaintiff's employment.

293.    By terminating Plaintiff's employment because Plaintiff carried a firearm while he was off-duty, the SEC has effectively punished Plaintiff for exercising his Second Amendment right of self-defense, the same right held by every American, whether employed by the federal government, self employed, or employed by a private business.

294.    In placing Plaintiff on administrative leave and terminating Plaintiff's employment, Defendants were acting under color of federal law, custom, usage, and regulation.

WHEREFORE, the plaintiff, David P. Weber, respectfully demands judgment in his favor and against the Defendants in an amount not less than TWENTY MILLION DOLLARS ($20,000,000.00) in compensatory damages and TWENTY MILLION DOLLARS ($20,000,000.00) in punitive damages plus reasonable attorney fees and the costs of this litigation, reinstatement with full back pay and benefits, and such other and further relief as this Honorable Court deems just and proper.

### COUNT VI
**(Fifth Amendment – Declaratory and Injunctive Relief)**

295.    Plaintiff adopts and incorporates by reference the allegations contained above with the same effect as if herein fully stated.

296.    Plaintiff has Fifth Amendment protection from being deprived of liberty or property without due process of law.

297.    Plaintiff has a constitutionally protected liberty interest in his reputation and in maintaining his employment and to follow his chosen profession without unreasonable interference by the government.

298.     As described above, Defendants made defamatory and slanderous statements about Plaintiff.

299.     These malicious and defamatory statements amounted to a governmental attack on Plaintiff's personal and professional reputation.

300.     These malicious and defamatory statements were designed to discredit Plaintiff, such that his allegations of misconduct by other SEC employees would appear to be not credible.

301.     With every potential employer now able to read the SEC's false allegations and Plaintiff's current work status on the internet, he is effectively unemployable in the private sector.

302.     Defendants placed Plaintiff on administrative leave, with pay, in order to prevent Plaintiff from availing himself of his procedural rights under federal regulations and statutes.

303.     Because Plaintiff had been cleared by numerous investigations, Defendants were legally required to take Plaintiff off administrative leave and to return him to duty.

304.     Defendants have failed to return Plaintiff to duty.  Instead, Defendants, after causing Plaintiff to remain in a position of indefinite limbo, effectively preventing Plaintiff from clearing his reputation, terminated Plaintiff's employment on October 31, 2012.

305.     Plaintiff's termination notice stated that the ground for his termination were the unauthorized carrying of a firearm while purportedly on duty.

306.     Plaintiff had no notice of this specific ground for termination.

307.    Plaintiff had no opportunity to respond and defend himself against this baseless allegation.

308.    The SEC previously recognized the Plaintiff as an unconditionally permanent employee.  In order to terminate him without providing notice or an opportunity to be heard, the SEC reversed its own position and changed his status to place the Plaintiff in a "trial period."  Doing so violated the SEC's own policies and procedures.

309.    The SEC did not provide the Plaintiff with prior notice or an opportunity to be heard in connection with his transition into a "trial period" in violation of SEC policies and procedures.

310.    The Plaintiff should be properly and lawfully categorized as a permanent employee who is no longer in a "trial period."  The SEC position to the contrary is in violation of law and SEC policies and procedures.

311.    The Plaintiff's termination was in violation of applicable law and SEC policies and procedures.

312.    The purported ground for termination is factually inaccurate, as Plaintiff had a constitutionally protected right to carry a firearm, and contrary to the SEC's Termination Memorandum, there was no testimony or evidence that Plaintiff carried any firearm on duty.

313.    More importantly, the statute cited by the SEC in terminating the Plaintiff simply does not preclude the conduct alleged.

314.     Importantly, the USPS OIG investigation cleared Plaintiff of any misconduct or wrongdoing.  Further, the two At-Risk reports both concluded that Plaintiff presented little to no risk of threat to the physical safety of others.

315.     Defendants have obstructed Plaintiff from availing himself of his due process rights by falsely suggesting that Plaintiff has no appeal rights under the Civil Service Reform Act.

316.     Because Defendants have maliciously defamed Plaintiff, unlawfully kept Plaintiff in a position of indefinite limbo, and unlawfully terminated his employment, Defendants have violated his liberty interest under the Fifth Amendment.

317.     Defendants should be ordered to reinstate Plaintiff, as his current status is unlawful and unauthorized.

WHEREFORE, the plaintiff, David P. Weber, respectfully demands declaratory and injunctive relief reversing his termination and suspension, reinstating him, awarding him back pay, raises, bonuses, benefits, overtime, reinstatement of seniority and tenure, and other orders necessary to make plaintiff whole, as well as attorney's fees and the costs of this litigation and finding that both his administrative leave and his termination were unlawful and in violations of his constitutional rights.  Further, the plaintiff respectfully demands that this Honorable Court issue an order: (1) requiring Defendants to abate and refrain from any further violations of the whistleblower provisions of the Acts; (2) requiring Defendants to explicitly rescind any and all policies that restrain or direct employees in connection with reporting of compliance issues; (3) requiring Defendants to prohibit harassment of those who engage, or are suspected of engaging in protected activity; and (4) requiring Defendants to take prompt and effective action

against any reported violations.  The plaintiff further respectfully demands an order (1)

expunging Plaintiff's discipline and (2) requiring Defendants to remove any records of

disciplinary action against Plaintiff, to preserve them only in the files of their legal

counsel and to use them only for purposes of defending rights in this proceeding.  Finally,

the plaintiff respectfully demands an order prohibiting Defendants from disclosing any

disparaging information about Plaintiff to prospective employers, licensing authorities, or

otherwise interfering with any applications he might make in the future.

**COUNT VII**
**(Administrative Procedure Act, 5 U.S.C. § 706 – Declaratory and Injunctive Relief)**

318.    Plaintiff adopts and incorporates by reference the allegations contained

above with the same effect as if herein fully stated.

319.    Plaintiff was on a non-duty, paid administrative leave status from May 8,

2012 to October 31, 2012.

320.    Plaintiff was placed on this status pursuant to a memo, which stated that

no adverse determination had been made against Plaintiff.

321.    The purported purpose of Plaintiff's placement on administrative leave

was that there were allegations that he was a physical threat to other employees in the

office.

322.    Defendants represented to Plaintiff that a determination would be made

regarding his administrative leave status after the conclusion of the USPS OIG

investigation.

323.    The initial threat assessment made against Plaintiff, by At-Risk, indicated

that Plaintiff was a "low risk" of physical violence.

324.     The USPS OIG investigation found that there was no evidence indicating that Plaintiff presents any risk of physical violence.

325.     Despite these findings, Plaintiff remained on administrative leave status.

326.     Defendants' failure to remove Plaintiff from this administrative leave status and place him in an on-duty status was unlawful.

327.     Under federal regulations and statutes, federal agencies may only place federal employees on non-duty, paid administrative leave status for a short duration, pending an investigation into whether those employees present a physical threat to other employees.

328.     The purpose of this non-duty, paid administrative leave status is to allow federal agencies to avoid the procedural requirements of the Civil Service Reform Act when there is an imminent and serious need to remove employees from the workplace, as the procedural requirements may delay or otherwise hinder the agency's ability to remove such employees.

329.     In the present case, there was never any imminent or serious need to remove Plaintiff from the workplace.  As previously mentioned, not one, but two investigations into Plaintiff's conduct have concluded that Plaintiff presents little to no risk of being a physical threat to others.

330.     Plaintiff was terminated on October 31, 2012.

331.     Plaintiff's termination notice stated that the ground for his termination were the unauthorized carrying of a firearm while on duty.

332.     Plaintiff had no notice of this specific ground for termination.

333.    Plaintiff had no opportunity to respond and defend himself against this baseless allegation.

334.    The purported ground for termination is factually inaccurate, as Plaintiff had a constitutionally protected right to carry a firearm and the conduct alleged was not precluded by any applicable law, rule, regulation or other authority.

335.    Further, the USPS OIG cleared the Plaintiff of all alleged misconduct. After he was cleared, the SEC terminated the Plaintiff for matters the USPS OIG found did not amount to misconduct.  Having entrusted the matter to the USPS OIG, the SEC was bound by its findings.  As there was definitively no misconduct, there are no grounds for termination and the Plaintiff should be reinstated.

336.    Defendants should be ordered to reinstate Plaintiff, as his current status is unlawful and unauthorized.

WHEREFORE, the plaintiff, David P. Weber, respectfully demands declaratory and injunctive relief reversing his termination and suspension, reinstating him, awarding him back pay, raises, bonuses, benefits, overtime, reinstatement of seniority and tenure, and other orders necessary to make plaintiff whole, as well as attorney's fees and the costs of this litigation and finding that both his suspension and his termination were unlawful and in violations of his constitutional rights.  Further, the plaintiff respectfully demands that this Honorable Court issue an order: (1) requiring Defendants to abate and refrain from any further violations of the whistleblower provisions of the Acts; (2) requiring Defendants to explicitly rescind any and all policies that restrain or direct employees in connection with reporting of compliance issues; (3) requiring Defendants to prohibit harassment of those who engage, or are suspected of engaging in protected

activity; and (4) requiring Defendants to take prompt and effective action against any

reported violations.  The plaintiff further respectfully demands an order (1) expunging

Plaintiff's discipline and (2) requiring Defendants to remove any records of disciplinary

action against Plaintiff, to preserve them only in the files of their legal counsel and to use

them only for purposes of defending rights in this proceeding.  Finally, the plaintiff

respectfully demands an order prohibiting Defendants from disclosing any disparaging

information about Plaintiff to prospective employers, licensing authorities, or otherwise

interfering with any applications he might make in the future.

## COUNT VIII
**(Inspector General Act, 5 U.S.C. App. 3, Declaratory Judgment Act, 28 U.S.C. §
2201 – Declaratory and Injunctive Relief)**

337.    Plaintiff adopts and incorporates by reference the allegations contained

above with the same effect as if herein fully stated.

338.    Section 3 of the Inspector General Act of 1978 states, "Each Inspector

General shall report to and be under the general supervision of the head of the

establishment involved or, to the extent such authority is delegated, the officer next in

rank below such head, but shall not report to, or be subject to supervision by, any other

officer of such establishment."

339.    Similarly, Section 8G of the Inspector General Act states, "Each Inspector

General shall report to and be under the general supervision of the head of the designated

Federal entity, but shall not report to, or be subject to supervision by, any other officer or

employee of such designated Federal entity."

340.     Section 8G further states that "the head of the designated Federal entity shall not prevent or prohibit the Inspector General from initiating, carrying out, or completing any audit or investigation[.]"

341.     The Inspector General Act defines "head of the designated Federal entity" as the "board or commission of the designated Federal entity[.]"  The Securities and Exchange Commission is a "designated Federal entity[.]"

342.     The Assistant Inspector General for Investigation is appointed by the Inspector General, and is a statutory position under the Inspector General Act.  The Assistant Inspector General for Investigations reports to and is supervised by the Inspector General.

343.     Plaintiff was the Assistant Inspector General for Investigations.

344.     The Inspector General resigned after allegations were made about his misconduct.

345.     Thereafter, the Acting Inspector General was relieved of her duties as a result of Plaintiff's protected disclosures to the Commissioners.

346.     Heslop, and other SEC employees and officers, placed Plaintiff on administrative leave.  In doing so, Heslop, and other SEC employees and officers, were acting *ultra vires*, as the Inspector General Act specifically prohibits any SEC employees, other than the Commission, from supervising the Inspector General.

347.     The placement of the AIG for Investigations on administrative leave is functionally equivalent to an act of supervision of the Inspector General. It is the Inspector General's responsibility to supervise the AIG for Investigations.

348.    At the time Plaintiff was placed on administrative leave, the Acting Deputy Inspector General was Jacqueline Wilson.  No Inspector General or Acting Inspector General existed with regards to the supervision of the Office of Investigation at the time.  Plaintiff's placement on administrative leave was done without Wilson's consent, or even knowledge. Wilson has never ratified Weber's placement on administrative leave, or his termination.

349.    If and to the extent that the order placing Plaintiff on administrative leave was sanctioned by Chairman Schapiro, it was done without legal authority.  The Inspector General Act, as amended by the Dodd-Frank Act, specifically requires supervision by the "commission[.]"  Therefore, the order placing Plaintiff on administrative leave is made pursuant to valid legal authority only if all of the Commissioners acted on it, and authorized same by at least majority vote.[4]

350.    Plaintiff's placement on administrative leave was ordered without the knowledge and consent of all the Commissioners.

351.    The order placing Plaintiff on administrative leave was made without legal authority.

352.    Similarly, and for the same reasons, the order terminating Plaintiff's employment was made without legal authority.

353.    The memorandum purporting to terminate Plaintiff's employment originated from the SEC Chicago Regional Office and was signed by Regional Director Merri Jo Gillette.

---

[4] The statute is silent as to whether a majority-vote of the Commission is sufficient, or whether all five Commissioners must agree to the action to be taken.  This same dispute has currently left the position of Inspector General at the SEC vacant for nearly one year.

354.    Under the Inspector General Act, Plaintiff's employment may be terminated only by his supervisor, Wilson, or the now-Acting Inspector General Jon Rymer, the full SEC Commission or some officer of the Commission, to whom such legal authority has been delegated.

355.    There is no indication that Regional Director Merri Jo Gillette has been authorized to supervise Plaintiff in his capacity as the SEC OIG Assistant Inspector General for Investigations.  The termination notice does not contain any mention of the legal authority under which the Regional Director may terminate Plaintiff's employment.

356.    In addition, numerous SEC OIG pending investigative matters pertain to the Chicago Regional Office of the SEC.  It would be a conflict of interest and violation of the Standards of Conduct for the Regional Director to be involved in terminating Plaintiff's employment, as Weber was the official charged with directing the investigations into the Chicago Regional Office.

357.    As such, the order terminating Plaintiff's employment was made without legal authority.

358.    Defendants should be ordered to reinstate Plaintiff, as his current status is unlawful and unauthorized.

WHEREFORE, the plaintiff, David P. Weber, respectfully demands declaratory and injunctive relief reversing his termination and suspension, reinstating him, awarding him back pay, raises, bonuses, benefits, overtime, reinstatement of seniority and tenure, and other orders necessary to make plaintiff whole, as well as attorney's fees and the costs of this litigation and finding that both his suspension and his termination were unlawful and in violations of his constitutional rights.  Further, the plaintiff respectfully

demands that this Honorable Court issue an order: (1) requiring Defendants to abate and refrain from any further violations of the whistleblower provisions of the Acts; (2) requiring Defendants to explicitly rescind any and all policies that restrain or direct employees in connection with reporting of compliance issues; (3) requiring Defendants to prohibit harassment of those who engage, or are suspected of engaging in protected activity; and (4) requiring Defendants to take prompt and effective action against any reported violations.  The plaintiff further respectfully demands an order (1) expunging Plaintiff's discipline and (2) requiring Defendants to remove any records of disciplinary action against Plaintiff, to preserve them only in the files of their legal counsel and to use them only for purposes of defending rights in this proceeding.  Finally, the plaintiff respectfully demands an order prohibiting Defendants from disclosing any disparaging information about Plaintiff to prospective employers, licensing authorities, or otherwise interfering with any applications he might make in the future.

## JURY DEMAND

Plaintiff demands a jury trial as to all claims so triable.

Respectfully submitted,
JOSEPH, GREENWALD & LAAKE, P.A.


_____/s/_____
Cary J. Hansel
6404 Ivy Lane, Suite 400
Greenbelt, MD 20770
(301) 220-2200
*Counsel for Plaintiff*